IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMANTHA CORBIN and THOMAS ROSS, on behalf of Plaintiffs and the class members described below, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) |
| LAYMA, LLC, also known as LAYAMA, LLC, and doing business as LITTLE LAKE LENDING; BEN G. RAY, III; and JOHN DOES 1-20, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT – CLASS ACTION

1. Plaintiffs, Samantha Corbin and Thomas Ross, bring this action to secure redress from predatory and unlawful loans (such as Exhibits A-B). The loans are made in the name of Defendant Layma, LLC, also known as Layama, LLC, and doing business as Little Lake Lending ("Layma, LLC"). Defendant Ben G. Ray, III purports to be the manager and chief executive officer of Layma, LLC. Other parties involved in making the loans are named as John Does 1-20.

2. Plaintiffs seek a declaratory judgment that the loans are void and an injunction against their collection (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III – the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO) (Count IV).

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Jurisdiction may also exist under 28 U.S.C. § 1332(d).

1

4. This Court has personal jurisdiction over Defendants because they:

a. Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

5. Venue is proper because acts to obtain and collect the loans impacted Plaintiffs in Chicago, Illinois.

6. Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

### Plaintiffs

7.  Plaintiff Samantha Corbin is a resident of Chicago, Illinois.

8.  Plaintiff Thomas Ross is a resident of Urbana, Illinois.

### Defendants

9.  Defendant Layma, LLC is an online lender that offers loans to consumers at annual percentage rates in excess of 700% via the website www.littlelakelending.com. (Exhibit C)

10. Defendant Layma, LLC currently purports to be a "wholly-owned and operated limited liability company of the Big Valley Band of Pomo Indians of the Big Valley Rancheria ('Tribe'), a federally-recognized sovereign American Indian tribe." It uses the address of 2726 Mission Rancheria Rd. Lakeport, CA 95453. (Exhibits A-B)

11. In the recent past, Defendant Layma, LLC purported to be "a commercial enterprise and instrumentality of the Lac du Flambeau Band of Lake Superior Chippewa Indians, a federally recognized sovereign Indian nation (the 'Tribe'), which . . . operates within the interior boundaries of the Tribes' reservation in Lac du Flambeau, WI." (Exhibit D)

12. In fact, Layma, LLC is a "rent-a-tribe" scheme, in which non-Native American persons conduct business as a purported instrumentality of Native American tribes to evade state usury laws, paying a small percentage of the proceeds to the tribe.

13. Plaintiffs' loan agreements, Exhibits A-B, contain standard "boilerplate" provisions which are identical to the provisions found in a loan agreement used by Big Picture Loans, LLC, a lending entity purportedly owned by the Lac Vieux Desert Band of Lake Superior Chippewa Indians. (Exhibit E) For example, Exhibit A, Exhibit B, and Exhibit D contain a "Tribal Dispute Resolution Procedure Provision" that "does not create any binding procedural or substantive rights" for the consumer.

14. A company called Tribal Loan Management, LLC ("TLM"), operated by attorney Rob Rosette of Rosette, LLP, entered into an Exclusivity Agreement and Letter of Intent with the

3

Lac Vieux Desert Band "to develop and operate a lending operation providing small loans to consumer[s] over the internet[.]" (Exhibit F, at JPB00382) TLM undertook to "provide an entire turn-key lending operation to provide consumers with small loans." (Exhibit F, at JPB00383) A lender wholly owned by the Lac Vieux Desert Band entered into a Servicing Agreement with a non-Indian "servicer" (Exhibit G), pursuant to which the servicer received the vast majority of revenue generated.

15. Defendant Ben G. Ray, III may be found at 2726 Mission Rancheria Rd., Lakeport, CA 95453. He is the manager and chief executive officer of Layma, LLC, and purports to be in charge of its lending operations. Ben G. Ray, III holds himself out as a provider of consulting and contracting services to tribal governments.

16. Both the Big Valley Band of Pomo Indians of the Big Valley Rancheria and the Lac du Flambeau Band of Lake Superior Chippewa Indians have a history of entering into such "rent-a-tribe" arrangements.

17. Numerous Internet lenders have operated using the addresses of 2720 or 2726 Mission Rancheria Rd., Lakeport, CA 95453, a small building of about 1200 square feet. (Exhibit H) In addition to Layma, LLC, these lenders have included:

    a.    Freedom Cash Lenders;

    b.    Tremont Lending;

    c.    Credit Cube;

    d.    Net Cash Lender;

    e.    Rushmore Credit;

    f.    Big Valley Financial;

    g.    Big Eye Lending;

    h.    Solid Cash Solutions;

    i.    Kali LLC dba Condor Credit;

    j.    Liberty Cash Lenders;

    k.  Cashland Loans; and

    l.  Green Arrow Solutions.

  18.  The Big Valley Band of Pomo Indians of the Big Valley Rancheria has less than seven-hundred members.

  19.  The existence of multiple lenders purportedly belonging to very small Native American tribes is indicative of a "rent-a-tribe" arrangement. Each lender typically represents a different group of non-Native American persons. Sometimes a group changes its name to evade regulatory scrutiny.

  20.  Layma, LLC does business in Illinois over the Internet, via text message, via Automated Clearing House transactions, and over the telephone.

  21.  At no time have Defendants had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling them to make loans to Illinois residents at more than 9% interest.

  22.  Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

  23.  Defendants sought out Illinois residents for such loans.

  24.  On information and belief, the principal economic benefit of the activities of Layma, LLC is received by non-Native American persons.

  25.  Defendants John Does 1-20 are other natural and artificial persons involved in the lending activities described herein.

## FACTS RELATING TO PLAINTIFFS' LOANS

  26.  On or about March 21, 2023, Plaintiff Samantha Corbin took out an installment loan from Layma, LLC (Exhibit A). The loan had an amount financed of $1200 and a disclosed annual percentage rate of 700%.

  27.  On or about March 21, 2023, Plaintiff Thomas Ross took out an installment loan from Layma, LLC (Exhibit B). The loan had an amount financed of $1,200 and a disclosed annual

percentage rate of 480%.

28. Plaintiffs Thomas Ross and Samantha Corbin made payments on their respective loans, including interest.

29. Layma, LLC claims that amounts are still outstanding.

30. Plaintiffs' loan agreements (Exhibits A-B) are written on a standard form loan agreement used by Layma, LLC on a regular basis.

31. Defendants regularly make loans to individuals in Illinois at such rates.

32. The Layma, LLC website (Exhibit C) listed states in which Defendants would not make loans. Illinois was not one of these states. Defendants thus sought business from Illinois consumers.

33. The loans were obtained for personal, family or household purposes and not for business purposes.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

34. Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq*. "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

35. Under 815 ILCS 123/15-10-5(b), "[a]ny violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

36. Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

37. Any loan made by an unlicensed person to an Illinois resident at more than 9%

interest is void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

38. Any loans to Illinois residents at more than 9% interest that are made by unlicensed lenders violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

39. Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq*). It applies to persons who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engage in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

40. Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

41. The Illinois Department of Financial and Professional Regulation has repeatedly

brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569, *In the Matter of Money Mutual, LLC*, No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

## RENT-A-TRIBE SCHEMES

42. In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

43. Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

44. The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe.

45. In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

46. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

47. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to

have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

48. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by non-tribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

49. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

50. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

51. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

**COUNT I – DECLARATORY AND INJUNCTIVE RELIEF AGAINST ILLEGAL CONDUCT**

52. Plaintiffs incorporate paragraphs 1-51.

53. This claim is against all Defendants.

54. There is a controversy between Plaintiffs and the class, on the one hand, and Defendants, on the other, as to whether Plaintiffs and the class members must repay the loans made to them.

55. Declaratory relief will resolve such controversy.

56. An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## CLASS ALLEGATIONS

57. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

58. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Layma, LLC at more than 9% interest (c) which loan has not been paid in full.

59. Plaintiffs may alter the class definition to conform to developments in the case and discovery.

60. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

61. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

62. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

63. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

64. Defendants have acted on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate.

65. The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

    i. Injunctive relief;

    ii. Declaratory relief;

    iii. Restitution of all amounts collected on the loans from members of the class;

    iv. Costs of suit; and

    v. Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

66. Plaintiffs incorporate paragraphs 1-51.

67. This claim is against all Defendants.

68. Defendants contracted for and collected loans at more than 9% interest from Plaintiffs and the class members, in violation of 815 ILCS 205/4.

69. Plaintiffs and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

70. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

71. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Layma, LLC at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

72. Plaintiffs may alter the class definition to conform to developments in the case and

discovery.

73. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

74. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

75. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

76. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

77. A class action is superior for the fair and efficient adjudication of this matter, in that:

   a. Individual actions are not economically feasible.

   b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

   i. Damages as provided in 815 ILCS 205/6.

   ii. Attorney's fees, litigation expenses and costs of suit; and

   iii. Such other and further relief as the Court deems proper.

### COUNT III – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

78. Plaintiffs incorporate paragraphs 1-51.

79. This claim is against all Defendants.

80. Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

81. Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

## CLASS ALLEGATIONS

82. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

83. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Layma, LLC at more than 36% interest (all of its loans qualify) (c) on or after March 23, 2021.

84. Plaintiffs may alter the class definition to conform to developments in the case and discovery.

85. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

86. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

87. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

88. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

89. A class action is superior for the fair and efficient adjudication of this matter, in that:

   a. Individual actions are not economically feasible.

   b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

    i.  Compensatory damages;

    ii.  Punitive damages;

    iii.  Attorney's fees, litigation expenses and costs of suit; and

    iv.  Such other and further relief as the Court deems proper.

## COUNT IV – RICO

90. Plaintiffs incorporate paragraphs 1-51.

91. This claim is against Defendant Ben G. Ray, III, who is the RICO "person."

92. All loans made in the name of Layma, LLC to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the usurious rate is at least twice the enforceable rate (9%).

93. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

94. Layma, LLC is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

95. Defendant Ben G. Ray, III is associated with this enterprise.

96. Defendant Ben G. Ray, III conducted or participated in the conduct of the affairs of Layma, LLC through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

97. Plaintiffs were deprived of money as a result.

## CLASS ALLEGATIONS

98. Plaintiffs bring this claim on behalf of a class.

99. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of Layma, LLC at more than 18% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

100. Plaintiffs may alter the class definition to conform to developments in the case and discovery.

14

101. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

102. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether the loans at issue are "unlawful debts" as defined in RICO.

    b. Whether Layma, LLC is an "enterprise."

    c. Whether Defendant Ben G. Ray, III is associated with Layma, LLC.

    d. Whether Defendant Ben G. Ray, III conducted or participated in the affairs of Layma, LLC through a pattern of making and collecting unlawful loans.

103. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

104. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

105. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

    i. Treble damages;

    ii. Attorney's fees, litigation expenses and costs of suit; and

    iii. Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 6207473)
Dulijaza (Julie) Clark (ARDC 6273353)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **JURY DEMAND**

Plaintiffs demand trial by jury.

>*/s/ Daniel A. Edelman*
>Daniel A. Edelman

## **NOTICE OF LIEN AND ASSIGNMENT**

   Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

            */s/ Daniel A. Edelman*
            Daniel A. Edelman

## **DOCUMENT PRESERVATION DEMAND**

       Plaintiffs hereby demand that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiffs, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiffs, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiffs demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman